**WINCHESTER VAN BUREN TENANTS ASSOCIATION, Petitioner,**

v.

**DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION, Respondent.**

**Borger Management, Inc., Intervenor.**

No. 87–1130.

District of Columbia Court of Appeals.

Argued Oct. 11, 1988.
Decided Nov. 17, 1988.

Eric S. Koenig, Washington, D.C., for petitioner. David M. Zolensky, was on the brief for petitioner, and Robert N. Sayler, Washington, D.C., entered an appearance for petitioner.

Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Asst. Corp. Counsel, Washington, D.C., filed a statement in lieu of brief for respondent.

Vincent Mark J. Policy, with whom Abraham J. Greenstein, Washington, D.C., was on the brief, for intervenor.

Before ROGERS,* Chief Judge, and FERREN and SCHWELB, Associate Judges.

I.

SCHWELB, Associate Judge:

Judges in this city who are called upon to decide landlord and tenant controversies in general and rent control cases in particular must accustom themselves to encounters with the esoteric and the arcane. When Judge Terry, writing for the court in *Afshar v. District of Columbia Rental Housing Commission,* 504 A.2d 1105, 1108 (D.C. 1986), characterized one sanction for "rent ceiling" violations, the "rollback" of rent,

---

* Judge Rogers was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on November 1, 1988.

as a "mysterious creature," he might as easily have been describing any one of a plethora of concepts in the legislation. To do well in this area of the law, a potentially bewildered jurist, more accustomed to hearing, *e.g.*, about undercover officers purchasing crack or P.C.P. from curbside entrepreneurs, has to be able to allude as casually to a "writ of restitution"[1] as if he were saying good morning, and must not get flustered when a law student says that the client wishes to *"Translux"*[2] or demands a *"Drayton* stay."[3] Because of the technical intricacy of many of the issues that arise and the jargon in which they are phrased, the courts depend, to a significant extent, on the expertise of the agency which is charged with making the legislation work and which deals with it every day.

In the present case, we are called upon to construe Section 208(g) of the Rental Housing Act of 1985, D.C.Code § 45–2518(g) (1981 and 1988 Supp.),[4] which provides that

no adjustments in rent under this act may be implemented until a full 180 days have elapsed since any prior adjustment.

The landlord contends that this provision prohibits more than one increase in the *actual rent charged* within the 180 day-period but that it does not preclude a single rent increase based on two separate permissible upward adjustments of the *rent ceiling.* The tenants claim, on the other hand, that only one increase in the *rent ceiling* may be put into effect during the statutory period, so that even a single increase in the rent which they have to pay is unlawful if it combines more than one increase in the rent ceiling.

Plausible arguments based on the language and structure of the Act can be made for either of these interpretations.

1. See Super.Ct. L & T R. 16(a).

2. *Trans–Lux Radio City Corp. v. Service Parking Corp.*, 54 A.2d 144 (D.C.Mun.App.1947) (the tenant's last chance to thwart the eviction crew).

3. *Drayton v. Poretsky Management, Inc.*, 462 A.2d 1115 (D.C.1983) ("primary jurisdiction" of agency requires court to defer decision).

4. References to the Act in this opinion are to the section number of the District of Columbia

The Rental Housing Commission,[5] however, addressed the opposing contentions in a comprehensive opinion and resolved the issue in the landlord's favor. Concluding that the agency's interpretation is neither plainly wrong nor inconsistent with the legislative purpose, *Remin v. District of Columbia Rental Housing Commission*, 471 A.2d 275, 279 (D.C.1984), we must, and do, affirm.

## II

The facts are not in dispute. The landlord, Borger Management, Inc., operates a 51–unit apartment building in northwest Washington. The tenants, Dyaz Godfrey and others, are members of the Winchester Van Buren Tenants Association. On May 7, 1985, the landlord was authorized to increase the rent ceiling at the complex by $18 per unit on the basis of "capital improvements" which had been made to the premises. *See* § 45–2520. The landlord was also eligible for an increase in the rent ceiling of 4.4% pursuant to § 45–2516(b), which provides for an increase of general applicability based on a rise in the consumer price index (CPI). On May 29, 1985, the landlord notified the tenants that effective July 1, 1985, the rent ceiling for each unit would be increased to reflect both of the authorized adjustments, and that the rent would be raised to the new ceiling.[6]

The tenants promptly filed a petition with the agency, alleging that the landlord's attempt to implement two rent ceiling adjustments at one time was in violation of § 45–2518(g). The Hearing Examiner agreed with the tenants and ordered the landlord to refund one of the rent increases. The Rental Housing Commission, however, reversed the Hearing Examiner's

Code, 1981 edition as reprinted in 1986, and 1988 supplement.

5. The Commission is sometimes referred to in this opinion as the agency.

6. The landlord's action had the effect, in Ms. Godfrey's case, of raising both her rent ceiling and her actual rent from $444 to $482. The other residents received comparable increases in their rent ceilings and rents.

decision. The Commission held that § 45–2518(g) prohibits more than one increase within 180 days in the rent actually charged, but does not preclude the landlord from putting into effect more than one increase in the rent ceiling. The tenants have asked this court to review the Commission's decision.

### III

To place the issue in this case in proper perspective, it is necessary to consider the purposes and structure of the Rental Housing Act of 1985. The Act represents a comprehensive scheme for the regulation of rental housing in the District. In passing the Act, the Council attempted to avert the economic hardships which tenants would confront in an unregulated housing market while at the same time accommodating the legitimate concerns of landlords. The statute was designed, among other things, "to protect low and moderate income tenants from the erosion of their income from increased housing costs," § 45–2502(1), and to "prevent the erosion of moderately priced rental housing while providing housing providers and developers with a reasonable rate of return on their investments." § 45–2502(5). The Act must be construed to accommodate each of these purposes. *See Guerra v. District of Columbia Rental Housing Commission,* 501 A.2d 786, 790 (D.C.1985).

Critical to the operation of the Act is its differentiation between the terms "rent" and "rent ceiling." *See Afshar, supra,* 504 A.2d at 1107. Rent means "the entire amount of money ... charged by a housing provider as a condition of occupancy or use of a rental unit." § 45–2503(28). In other words, rent is what the tenant actually has to pay. The "rent ceiling," on the other hand, is the sum of the "base rent," [7] and all duly authorized rent increases. §§ 45–2503(29), 45–2516(a). The "rent ceiling" represents, in lay terms, the most that the landlord is allowed to charge. The Act enumerates the grounds upon which the

rent ceiling may be increased. § 45–2517. The basic premise of the statutory scheme is that the rent may never exceed the rent ceiling.

The parties to the present dispute agree both that the rent charged must be within the rent ceiling and that the landlord becomes entitled at some point to one increase in the rent ceiling based on the capital improvements and a second based on the rise in the CPI. They part company with respect to the time when this may be accomplished. It is undisputed that this issue is governed by the provisions of § 45–2518(g), but the parties are in sharp disagreement as to what that section means.

The contentions of the contestants are summarized in some detail in the opinion the Rental Housing Commission. Briefly, the landlord argues that § 45–2518(g) is not ambiguous. Noting that the statute prohibits adjustments in *rent* within 180 days of the last adjustment, but is silent with respect to adjustments in the *rent ceiling,* the landlord contends that this language, literally construed, addresses only changes in the rent actually charged. The landlord, alluding to a number of provisions in the statute in which references to adjustments in rent obviously deal, in context, with the rent actually charged rather than with the rent ceiling, *see* §§ 45–2518(g), 45–2518(a)(2), 45–2518(f), submits that the use of the term "adjustment" does not automatically implicate the concept of *rent ceiling.* Pointing, by contrast, to §§ 45–2518(b)(1) and (2), which expressly refer to adjustments in the rent *ceiling,* the landlord argues that when the legislature meant the rent ceiling, it knew how to say so. The landlord also cites authority in this court holding that some provisions of § 45–2518 treat the term "rent" as referring to the rent actually charged, *Afshar, supra,* 504 A.2d at 1108–1109; *Weaver Bros., Inc., v. District of Columbia Rental Housing Commission,* 473 A.2d 384 (D.C. 1984) (construing predecessor statute), and

---

**7.** The "base rent" is defined as the amount legally charged or chargeable on April 1, 1985. § 45–2503(4).

invites our attention to two prior holdings of the Commission that § 45–2518(g)—the very provision here at issue—applies to actual rent rather than to the rent ceiling. *Thompson v. Yavalar,* TP 11,188 C.R.H. (April 11, 1986); *Lovithy v. Smithy Braedon Property Co.,* TP 11,661 C.R.H. (Sept. 26, 1986). Finally, the landlord contends that the construction for which the tenants contend would defeat the purpose of the statute by encouraging landlords to keep the actual rent at the rent ceiling and would cause an administrative nightmare in terms of record keeping.

The tenants argue, on the other hand, that the term adjustment in rent, as used in the Act, refers to the *rent ceiling* as authorized by § 45–2517 *et seq.* They note that § 45–2518 is entitled "increases above base rent," and contend that the reference to adjustments in rent in § 45–2518(g) must be read in terms of the title of the section. Claiming that the language of the statute is unambiguous, the tenants contend that the sequence of the various provisions in the statute shows that the phrase "adjustments in rent" uniformly refers to rent ceilings and that the legislature was therefore talking about rent ceilings in § 45–2518(g). They say that, properly construed, that section means that

No [change in the rent ceiling] under this chapter may be [collected] until a full 180 days have elapsed since any prior [change in the rent ceiling.] [8]

The tenants also contend that the interpretation of the statute proposed by the landlord and adopted by the Commission resolves all ambiguities in favor of the landlord, in violation of the precept that the Act was intended to balance the interests of landlords and tenants. *Guerra, supra,* 501 A.2d at 790.

### IV

The Commission began its analysis by the observation, with which we agree, that the meaning of § 45–2518(g) is not apparent on its face, although both parties have dogmatically asserted that it is.

Explaining that the 1985 Act is one of a series of enactments going back to 1973, each building upon its predecessors, and each the subject of political controversy and compromise, the Commission found that

such a law necessarily contains serious inconsistencies and ambiguities in language and meaning which generate disputes raising difficult questions of statutory interpretation. This case is one of them.

The Commission disagreed with the tenants' contention that the phrase "adjustments in rent" consistently refers to adjustments of the rent ceiling. To the contrary, in the Commission's view, "a variety of inconsistent usages appears." The Commission then continued:

In the context of this case we are required to read the phrase "no adjustments in rent under this act" in § 45–2518(g) as a reference to the rent actually charged. Under that construction the section means the rent charged may be changed unless 180 days have not elapsed since any prior change in the rent charged. That is, there can be but one change in the rent charged within a 180–day period.

The Commission also thought that if, as the tenants contend, landlords were required to limit rent increases to the amount of a single rent ceiling adjustment within any 180–day period, they would have a strong incentive to raise the rent immediately to the new ceiling as soon as the ceiling increase was authorized. This, in the Commission's view, would not be in the best interest of tenants, for landlords would discontinue what the Commission deemed the "frequent practice" [9] of post-

---

**8.** The bracketed phrases represent the language inserted by counsel for the tenants to explicate the correct meaning of the statute as they see it. Their own reconstruction presents problems for their position, however, since landlords collect rent, not rent ceilings or changes therein.

**9.** Although we must defer to the Commission's expertise as to how frequently landlords postpone raising the rent to the rent ceiling, we note that in the present case the rent charged by *this* landlord was consistently at the ceiling. We therefore find understandable the tenants' response that they would prefer protection by

poning for business reasons the raising of the rent in response to a ceiling increase.

Turning to the spectre of an administrative nightmare which the landlord says would follow adoption of the tenants' proposal, the Commission stated that it would cause serious administrative problems for the agency, as well as for landlords and tenants, if they were forced to keep track of the various 180–day periods associated with each and every rent ceiling increase, in order to determine when the corresponding rent increase can be demanded.

Finally, the Commission concluded that its interpretation of the Act was fully in keeping with the general purpose and policy that motivated the Council to enact the statute. Observing that "the chief mechanism for stabilizing rents is the rent ceiling," the Commission stated that

> [o]nce a housing provider has been authorized to increase the ceiling, the statute imposes minimal controls over when and how he can raise the rent to the newly adjusted ceiling.... [Under] § 45–2518(g), he may demand an increase in rent no more frequently than once in each 180–day period regardless of when or under what section the ceiling adjustment was authorized.

## V

Courts should give great weight to any reasonable construction of a regulatory statute adopted by an agency charged with its enforcement. *McMullen v. Police and Firefighters' Retirement and Relief Board*, 465 A.2d 364, 366 (D.C.1983) (*per curiam*). This is particularly true where, as in some measure here, we have a

> contemporaneous construction of a statute by the men[10] charged with the responsibility of setting its machinery in

motion, of making the parts work efficiently and smoothly while they are yet untried and new.

*Norwegian Nitrogen Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (Cardozo, J.). To persuade us to reject the Commission's construction of § 45–2518(g), the tenants must show that it is plainly wrong or incompatible with the statutory purpose. *Remin, supra,* 471 A.2d at 279.

The tenants have not carried their burden. The agency's construction is at least as faithful to the statutory language and structure as that offered by the tenants; indeed, their reformulation of § 45–2518(g) founders in its own syntax, for it has landlords collecting rent ceilings and changes therein, rather than rent. *See,* p. 54, n. 8, *supra.* It is uncontested, even uncontestable, that the Act's principal protections for tenants are the imposition of a rent ceiling and the prohibition against upward adjustment of that ceiling except on specifically enumerated grounds. That being so, the tenants have not persuaded us that it is incompatible with the purposes of the statute to read § 45–2518(g) more or less literally as permitting legitimate rent ceiling adjustments as they become due but prohibiting more than one actual rent increase in a 180–day period. Accordingly, the decision of the Rental Housing Commission is

AFFIRMED.

---

statute to being forced to rely on the tender mercies or business judgment of their landlords. It is a trifle odd to hear a landlord arguing that his proposed construction of the Act is good for tenants because it will cause other landlords to be more generous to them than this landlord was in the present case.

**10.** In the present case, the Commission is chaired by Hon. Belva D. Newsome, a woman.

We are confident that, if he had been writing half a century later, Justice Cardozo, a jurisprudential giant by any reasonable yardstick, would have used a more inclusive (and enlightened) term.