**JAMES PARRECO & SON, Petitioner,**

v.

**DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION, Respondent,**

**Tenants of 2231 California Street, N.W., Intervenor.**

**No. 88–607.**

District of Columbia Court of Appeals.

Argued Sept. 14, 1989.
Decided Nov. 28, 1989.

Roger D. Luchs, for petitioner.

Richard W. Luchs, with whom Abraham J. Greenstein, Washington, D.C., was on the brief, for amici curiae, Washington, D.C. Ass'n of Realtors, Inc. and Apartment and Office Bldg. Ass'n of Metropolitan Washington, Inc.

James C. McKay, Jr., Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Eric M. Rome for intervenor.

Before STEADMAN, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Although understandably less popular with landlords, of whom there are relatively few, than with tenants, of whom there are many, rent "stabilization" and rent control have been around for a long time in the District of Columbia, and their death-knell

on constitutional grounds does not appear to be around the corner. *Pennell v. City of San Jose,* 485 U.S. 1, 8–15, 108 S.Ct. 849, 855–859, 99 L.Ed.2d 1 (1988); *see also Hornstein v. Barry,* 560 A.2d 530, 537–38 (D.C.1989) (*en banc*). The terminology of some of the provisions of our legislation is not characterized by the most luminous clarity, *see Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 550 A.2d 51 (D.C.1988), and this court will generally defer to the Rental Housing Commission's resolution of any ambiguity, provided that the agency's construction is reasonable and consistent with the language and purposes of the statute. *Id.* In the present case, however, the agency has adopted an interpretation of a provision of the statute relating to hardship rent increases which is incompatible with its plain language, and we are not persuaded that a literal construction produces absurd or manifestly unjust results antagonistic to the statutory purposes. Neither the Commission nor this court is authorized to read into an unambiguous statute language that is not there, or to rewrite legislation to make it more "equitable" or "fair." [1] Accordingly, we reverse the Commission's decision and remand for further proceedings.

## I

Petitioner James Parreco & Son (hereinafter Parreco or the landlord) owns a multiple dwelling in northwest Washington to which the provisions of the Rental Housing Act apply. Parreco refinanced the property with a second trust and thereafter filed a hardship petition requesting that he be permitted to increase the rent, upon the grounds that he was not receiving a ten per cent return on his equity, as provided by D.C.Code § 45–1523 (1981) (recodified 1985).[2] He now appeals from a decision of the Rental Housing Commission holding

that he is not entitled, in calculating his net income from the property, to deduct interest payments on the mortgage loan, because he has failed to demonstrate that the borrowed money has been reinvested in the premises. Parreco has, however, been required to treat the same mortgage loan as an encumbrance on the property, thus reducing the value of his equity in the calculation of his rate of return.

To explain the context in which the issue in this case arises, we begin with a brief exposition of the statutory framework. A primary purpose of the rent stabilization program is "[t]o protect low and moderate income tenants from the erosion of their incomes from increased housing costs." D.C.Code §§ 45–1502(1) (1981), 45–2502(1) (1986 Repl.). To achieve that end, rent increases in housing covered by the Act are tightly controlled. Rents may be raised only for reasons explicitly authorized by the legislation, *e.g.,* a rise in the consumer price index, or capital improvements to the property. *See Winchester, supra,* 550 A.2d at 52, and the statutory provisions there discussed.

What the Commission, in its decision in this case, has termed a "sometimes competing goal" of the legislation is to provide landlords and developers with a reasonable rate of return on their investments. §§ 45–1502(5) (1981), 45–2502(5) (1986 Repl.). The chief mechanism for achieving this goal is the hardship rent increase. As the Commission correctly explained:

> if the landlord demonstrates that he is earning less than the minimum rate provided by statute, the Rent Administrator must approve rent increases in an amount sufficient to produce the guaranteed rate, fixed by § 213(a) of the 1980 Act as "a 10 percent rate of return computed according to [statutory formula]." *Id.,* § 45–1523(a).[3]

---

1. As noted below, there is considerable disagreement among the parties as to which construction is the fairest of them all.

2. Section 45–1523, which was enacted as part of the Rental Housing Act of 1980, was recodified in the Rental Housing Act of 1985 and is now D.C.Code § 45–2522 (1986 Repl.). For the con-

venience of the reader, we include in this opinion the citations to the relevant provisions of both Acts.

3. Under the 1985 Act, the landlord is entitled to a 12% rate of return. *See* § 45–2522(a) (1986 Repl.).

In order to determine whether the landlord is receiving the specified rate of return, one must first ascertain the net income from the property and then divide it by the landlord's equity.

The Act provides that, in calculating "net income," the landlord may deduct, among other items, "[i]nterest payments." §§ 45–1523(b)(1)(G) (1981), 45–2522(b)(1)(G) (1986 Repl.). The term "interest payments," which appears only in the provision of the Act relating to hardship petitions, is defined in §§ 45–1503(11) (1981) and 45–2503(18) (1986 Repl.) as

> the amount of interest paid during a reporting period on a mortgage or deed of trust on a housing accommodation.

A number of items, including "[m]ortgage principal payments," are explicitly enumerated as not being deductible. §§ 45–1523(b)(1)(A)(v) (1981), 45–2522(b)(1)(A)(v) (1986 Repl.).

The term "equity" likewise appears only in the portion of the statute dealing with hardship petitions. Sections 45–1503(7) (1981) and 45–2503(13) (1986 Repl.) both define equity as

> the portion of the assessed value of a housing accommodation that exceeds the total value of all encumbrances on the housing accommodation.

There is nothing in the definition either of "interest payments" or of "equity" to suggest that the Council was referring only to those mortgages or encumbrances of which the proceeds have been reinvested in the housing accommodation. In spite of the statutory language, however, the Commission held that a literal reading of the definition of "equity" is appropriate, but that the landlord is nevertheless not entitled, in determining his net income, to deduct interest payments on mortgage loans of which the proceeds have not been reinvested in the property. Quoting from its decision in

*Tenants of 1323 Clifton St., N.W. v. Joseph Beavers*, HP 10,692 (RHC July 22, 1987) at 8, the Commission held that

> interest is a deductible expense only if the money that it (the loan) obtains is devoted to or invested in the particular housing accommodation for which the hardship increase is sought. This is the nexus that is essential for deductibility, not simply that the loan is secured by equity in the property.

The landlord contends that the Commission's decision should be reversed on the grounds that its interpretation of the interest provision is incompatible with the plain language of the statute.[4] In the alternative, he suggests that if the Commission's restrictive construction is sustained, then "symmetry" requires that only those mortgage loans of which the proceeds have been reinvested in the housing accommodation should likewise be subtracted from assessed value to determine "equity." The District of Columbia and the tenants ask us to interpret the statutory definition of "equity," but not of "interest payments," according to the plain meaning of the words. They contend that the Commission's decision is correct, and that to allow deduction of interest where the loan has not been used to benefit the property is contrary to the purposes of the Act. We agree with the landlord and find the Commission's construction untenable.

## II

■ In interpreting a statute, we are mindful of the maxim that we must look first to its language; if the words are clear and unambiguous, we must give effect to its plain meaning. *Office of People's Counsel v. Public Serv. Comm'n*, 477 A.2d 1079, 1083 (D.C.1984); *Peoples Drug Stores, Inc. v. District of Columbia*, 470

---

4. There is some dispute between the parties as to whether the landlord explicitly relied on the "plain language" argument in the proceedings before the Commission. There is no doubt, however, that the landlord did argue to the agency that, if the mortgage was to be considered an encumbrance for the purpose of computing the landlord's equity, then the interest payments on the underlying loan must be deductible whether or not the proceeds of the loan were used in connection with the property. Under the circumstances, we conclude that the issue has been adequately preserved. *See National Auto & Casualty Ins. Co. v. Industrial Accident Comm'n*, 95 Cal.App.2d 10, 14, 212 P.2d 1, 4 (1949); 4 Davis, Administrative Law Treatise § 26:7, at 444 (2d ed. 1983), and authorities there cited.

A.2d 751, 753 (D.C.1983) (*en banc*). The primary rule of statutory construction is that the intent of the legislature is to be found in the language which it has used. *United States v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897); *Peoples Drug Stores, supra,* 470 A.2d at 753. Moreover, the words of the statute should be construed according to their ordinary sense, and with the meaning commonly attributed to them. *Peoples Drug Stores, supra; see also United States v. Thompson,* 347 A.2d 581, 583 (D.C.1975). "The words used, even in their literal sense, are the primary and ordinarily the most reliable source of interpreting the meaning of any writing." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (Learned Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

We must not, of course, make a fetish out of plain meaning. As Judge Hand stated with his customary eloquence in *Cabell, supra,*

> it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

148 F.2d at 739.[5] Courts do not wallow in literalism where the plain language of a statute would lead to absurd consequences which the legislature could not have intended. *United States v. Brown,* 333 U.S. 18, 27, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948); *Holt v. United States,* 565 A.2d 970, 972 (D.C.1989) (*en banc*). Moreover, as the Supreme Court stated in *Perry v. Commerce Loan Co.,* 383 U.S. 392, 400, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966) (quoting *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940)):

Frequently, ... even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words.

*Accord Public Citizen v. United States Dep't of Justice,* — U.S. —, —, 109 S.Ct. 2558, 2566 n. 9, 105 L.Ed.2d 377 (1989); *see also Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), recognizing the "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers."

Nevertheless, words are important, and the burden on a litigant who asks the court to disregard their plain import is not a light one. This court will " 'look beyond the ordinary meaning of the words of a statute only where there are persuasive reasons for doing so.' " *Holt, supra,* 565 A.2d at 972–973 (quoting *Peoples Drug Stores, supra,* 470 A.2d at 755). To invoke too readily the "absurd result" doctrine, or related notions which are said to justify the disregard of statutory language,

> creates too great a risk that the Court is exercising its own "WILL instead of JUDGMENT," with the consequence of "substitut[ing] [its own] pleasure to that of the legislative body." The Federalist No. 78, p. 469 (C. Rossiter ed. 1961) (A. Hamilton).

*Public Citizen, supra,* 109 S.Ct. at 2575 (Kennedy, J., dissenting).

■ In the present case, the plain language of the definition of "interest payments" admits of only one construction. The limitation which the District and the tenants would have us engraft upon it is nowhere to be found in the words which the Council wrote. The statute speaks of a

---

**5.** As the Supreme Court recently stated in *Public Citizen v. United States Dep't of Justice,* — U.S. —, —, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989):

> Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it

seems inconsistent with Congress' intention, since the plain-meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." *Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) (Holmes, J.).

mortgage *on* a housing accommodation, not of one which secures a loan the proceeds of which have been reinvested in the property. Moreover, the enumeration of items not deductible, including payments of principal, implies that there are no others; *expressio unius est exclusio alterius.*[6]

To the extent that the past is prologue in the construction of the statute, the plain meaning of the words is supported by history. Prior to the enactment of the Rental Housing Act of 1980, the formula for calculating an allowable hardship increase specifically excluded mortgage interest payments. D.C.Code § 45–1693(b)(1)(A) (1973 ed., Supp. VII 1980) (amended and recodified 1981; recodified 1985). Consistently, the law did not require consideration of encumbrances on property in determining the base for calculating the rate of return, but focused instead only on the market value of a housing accommodation. *See* § 45–1693(b)(2) (1973 ed., Supp. VII 1980) (amended and recodified 1981; recodified 1985). After the 1980 Act was passed, mortgage loans became relevant to both parts of the equation. They had the effect of reducing net income, because interest payments had become deductible. At the same time, the insertion of encumbrances into the calculus resulted in the rate of return being based on an "equity" which was obviously lower than market value. It therefore appears that under both statutory schemes the Council viewed "equity" and "interest payments" as interrelated and symmetrical concepts. We think it improbable that the Council intended to permit a mortgage, the proceeds of which have not been reinvested in the property, to affect only the bottom of the fraction but not the top.

Moreover, there is no doubt—and the tenants and the District concede—that if the landlord had taken out a purchase money mortgage at the time that he acquired the property, he would be entitled to deduct the interest payments even if the practical consequence of his borrowing were to enable him to use his other funds to purchase a yacht, invest in municipal bonds, or finance a party in Casablanca, rather than to purchase the property. For present purposes, the effect of permitting the deduction here at issue is no different. The Council could rationally conclude that the deductibility of interest payments for purposes of computing net income should be the same irrespective of whether the loan secured by the property was made at the time the property was purchased or at some time thereafter.

To be sure, there are circumstances under which a literal interpretation of the statutory language could operate in a manner detrimental to the financial interests of the tenants. If interest rates are high, and the landlord borrows money at fifteen per cent interest while the Rental Housing Act assures him of a return of only ten per cent, then he is in a position to pass on to his tenants a part of his cost of borrowing. This is so because, although the equity at the bottom of the fraction will be adjusted by the amount of the new encumbrance, it will not be affected by the high interest rate on the loan. Accordingly, there is

---

6. The tenants discern an ambiguity in the statute, in that the other listed exclusions are part of the cost of the operation of a housing accommodation. They say that "interest payments" must have been intended to be subject to the same qualification. The problem with this approach is that the Council could have said so, but did not. In fact, interest payments are deductible pursuant to one subsection of the statute, §§ 45–1523(b)(1)(G) (1981), 45–2522(b)(1)(G) (1986 Repl.), and are not included among operating expenses, which are deductible pursuant to a different subsection, §§ 45–1523(b)(1)(A) (1981), 45–2522(b)(1)(A) (1986 Repl.). Moreover, the equity in a housing accommodation, as we have noted, is deemed reduced by an encumbrance no matter what use has been made of the proceeds of the underlying loan, so that the Council has obviously considered matters not involving the cost of the operation in determining eligibility for a hardship increase.

The tenants also argue that the stated purpose of the hardship provision is to provide the landlord with a fair return on his investment, and that the proceeds of Parreco's loan in this case are not invested in the property. Although superficially appealing, this contention founders on the reality that the hardship increase provision itself assures a return on the landlord's *equity.* Moreover, it would distort the concept of return on investment to count loans of the kind here at issue in determining only the bottom of the statutory fraction but not the top.

some incentive for a landlord to use rental property as security for a new loan while interest rates are high, since the tenants may lawfully be compelled to help him to defray his expenses by paying higher rent. Although, theoretically, the tenants would benefit if the landlord took out a loan while interest rates were lower than the guaranteed rate of return, it is less probable that this would occur, since it often would not be in the landlord's interest to encumber an asset earning ten per cent to obtain a loan at a lower rate. It may be that the legislation would be more balanced if the landlord were permitted to deduct interest payments only up to the guaranteed rate of return, and not beyond, but that is not a question to be resolved by statutory construction.

Reasonable people may surely differ as to where the equities lie. "[P]erhaps the give and take of the political process has, in this instance as in others, produced less than perfect legislation." *Hornstein, supra,* 560 A.2d at 534. Perfection, however, is not readily achievable, and we cannot say that the consequences of a literal reading of the statute are so absurd [7] or unjust that we may rewrite it to achieve a result which some might deem more equitable.

### III

The District and the tenants contend that we should defer to the expertise of the agency and sustain its construction of the statutory language, even though our own interpretation might be different if we were working on a clean slate. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984). The District reminds us that

[i]n reviewing the construction of a statute by the agency charged with its interpretation and enforcement, the agency's interpretation is controlling unless it is

plainly erroneous or inconsistent with the statute.

*Totz v. District of Columbia Rental Hous. Comm'n,* 412 A.2d 44, 46 (D.C.1980) (per curiam). The District also contends that the section of the Act permitting rent increases based on hardship operates as a limited exemption from the statutory restrictions and that "[e]xemptions from rent control laws should be narrowly construed in light of the intent of the legislature and the plain meaning of the legislation." *Remin v. District of Columbia Rental Hous. Comm'n,* 471 A.2d 275, 279 (D.C.1984).

We are unable to agree with these contentions. *Totz* recognizes that courts should not defer where the agency decision is "inconsistent with the statute." 412 A.2d at 46. *Remin* implicitly acknowledges that narrow construction of exemptions is inappropriate where the result would be contrary to the "plain meaning of the legislation." In *DeLevay v. District of Columbia Rental Accommodations Comm'n,* 411 A.2d 354, 359–60 (D.C.1980), this court held the agency's interpretation of another provision of the Act erroneous because it was inconsistent with the statutory language.

Moreover, the deference which courts owe to the interpretation by agencies of statutes which they administer is at its zenith where the administrative construction has been consistent and of long standing. *Atwater v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 566 A.2d 462, 468 (D.C.1989) and authorities there cited. Courts accord less weight to an agency's interpretation where these attributes are lacking. *Id.*

In the present instance, the Commission's most recent construction of the statute is neither of long standing nor consistent with its past rulings and regulations. In *Minnesota Gardens, Inc. v. Tenants of Minn. Gardens,* HP 10,415 (RHC May 21, 1984), the former Commission reasoned

---

**7.** A few examples of true absurdity are given in the *Holy Trinity* decision cited by the Court, *ante,* at 2565–2566, such as where a sheriff was prosecuted for obstructing the mails even though he was executing a warrant to arrest the mail carrier for murder, or where a medieval law against drawing blood in the streets was to be applied against a physician who came to the aid of a man who had fallen down in a fit. *See* 143 U.S., at 460–461, 12 S.Ct. at 512–13.

*Public Citizen, supra,* 109 S.Ct. at 2575 (Kennedy, J., dissenting).

that interest expense was includable as a reportable cost only if the proceeds of the underlying mortgage were used in connection with the housing accommodation for which a hardship increase was sought. In other words, the Commission read in a qualification to the word "mortgage" which was not included in the statutory language. The Commission recognized, however, that to insure uniformity in the treatment of mortgages, it was also necessary to carry over this qualification to the word "equity." Thus, the Commission concluded that if the proceeds of a mortgage were not used in connection with the subject housing accommodation, and the mortgage interest therefore did not qualify as an operating expense, then the value of the mortgage did not have to be deducted from the assessed value to determine the owner's equity. In other words, the mortgage was factored out of the hardship equation for *all* purposes—both as to the reporting of interest as an operating expense and as to the equity calculation.

In *Minnesota Gardens*, then, the Commission failed to adhere to the statutory language in either definition, but at least did so consistently. The Commission recognized that any narrowing of what constitutes a mortgage for purposes of this statute must be consistently applied to the bottom of the fraction as well as to the top. In the words of a popular song about love and marriage, "you can't have one without the other."

Moreover, in its regulations promulgated pursuant to the 1985 Act, the present Commission has specifically adopted the statutory definitions of the terms "equity" and "interest payments." *See* 14 D.C.M.R. § 45299.1 (1989).[8] Nothing in the regulations suggests the interpretation which the Commission adopted in the present case.

We further note that the persuasiveness of the Commission's construction is impaired by the apparent lack of any recognition that the result it has reached is at variance with the statutory language.[9] Indeed, the District, in defending the decision in this court, is placed in the anomalous position of arguing for "plain meaning" with respect to the statutory definition of equity, (and citing a plethora of cases that emphasize the primacy of the language used by the legislature), but ignoring or opposing "plain meaning" analysis with respect to "interest payments."[10] Under all of the circumstances, we do not think it appropriate to defer to the agency's interpretation here.

## IV

In this decision, we have taken the statute as written by the Council at face value, and accorded to its words their ordinary meaning. It may be that the result is not the "fairest of them all," particularly where a landlord takes out a second mortgage at an interest rate higher than the rate of return guaranteed by the Act and potentially passes some of the costs on to

**8.** As we have noted, the definitions in the 1985 Act are identical to those in its 1980 predecessor.

**9.** The Commission quotes *Guerra v. District of Columbia Rental Hous. Comm'n*, 501 A.2d 786, 790 (D.C.1985), as follows: "We are pursuaded [sic] that D.C.Code § 45–1524(a), allowing a vacancy increase, applies only when there has been some additional cost to the landlord that would justify the increase." This court held in *Guerra* that the landlord was not entitled to a vacancy increase because the unit in question had never become vacant. More pertinent to the present case are the court's statements in *Guerra* that "[i]t is a basic rule of statutory construction that courts must follow the plain and ordinary meaning of a statute because that is the meaning intended by the legislature," *id.* at 789, and that deference to the agency "is

unwarranted when the agency's construction is plainly inconsistent with the statute, as it is here," *id.* at 790.

*Guerra* also alludes to "another basic rule of statutory construction: that statutory provisions must not be viewed in isolation, but together with related provisions." *Id.* In our view, the Commission's treatment of mortgages differently in connection with "equity" from their treatment in relation to "interest payments" is incompatible with this part of the *Guerra* opinion.

**10.** In connection with "interest payments," the District cites *Marshall v. District of Columbia Rental Hous. Comm'n*, 533 A.2d 1271, 1275 (D.C. 1987), for the proposition that plain meaning analysis is inappropriate when the language has "only superficial clarity" and yields unjust results contrary to the legislative intent.

his tenants. If the Council perceives such unfairness, or if it intended a result different from the one we reach, a remedy may easily be fashioned. In the absence of ambiguity in the statute, however, correction of any problem that may be presented is the province of the legislature rather than of this court. Accordingly, the Commission's decision is reversed, and the case is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*